Fahey, J.
(dissenting). I respectfully dissent. Bedrock principles of insurance contract interpretation demand that we conclude that defendants are entitled to coverage with respect to the underlying matter as additional insureds under the policy of insurance issued to nonparty Breaking Solutions, Inc. (BSI) by plaintiff.
Facts
This declaratory judgment action overlies a personal injury action that had its genesis in the excavation of a subway tunnel in Brooklyn. In July 2008, defendant New York City Transit Authority (NYCTA) contracted with BSI for the supply of “concrete breakers” and related labor in connection with the project. Pursuant to the contract’s insurance requirements, BSI was to obtain, among other things, $2 million in general liability insurance, with respect to which NYCTA, defendant *328 MTA New York City Transit (MTA), and the City of New York were to be named as additional insureds.
BSI honored that commitment and obtained from plaintiff a policy of insurance that, as relevant here, provided an aggregate of $2 million in general liability coverage and contained an endorsement naming defendants as additional insureds thereunder. The subject endorsement (which bears form No. IFG-I-0160 1100) provides, in pertinent part, that defendants are additional insureds under the policy “with respect to liability for ‘bodily injury’ . . . caused, in whole or in part, by . . . [BSI’s] acts or omissions” (emphasis added).[1]
In February 2009, nonparty Thomas P. Kenny was employed by MTA in furtherance of the subject construction project. During the course of that work, an explosion and fire occurred when the drill of one of the machines supplied by BSI contacted a live electrical cable. At the time of the explosion, Kenny was perched on a benchwall, and he fell from that elevated work location while trying to evacuate the tunnel following that incident.
Kenny and his wife subsequently commenced the underlying action (in which they asserted causes of action for common-law negligence and violation of Labor Law §§ 200, 240 [1], and 241 [6], as well as for loss of consortium) in the United States District Court for the Eastern District of New York. BSI tendered the claims in that action to plaintiff under the policy, and plaintiff agreed to defend and indemnify BSI in that matter. Although it did not immediately accept the City’s separate *329 tender of coverage with respect to the underlying action, plaintiff initially agreed to provide the City with a defense in that matter subject to a reservation of rights.
Afterwards, the City commenced a third-party action against defendants seeking contractual indemnification with respect to the claims asserted against the City in the underlying action. Defendants, in turn, tendered coverage for the claims asserted against them in the third-party action to plaintiff, which agreed to defend defendants with respect thereto subject to a reservation of rights. The reservation of rights was based on plaintiffs theory that “it ha[d] not been determined whether liability was caused by acts or omissions of [BSI].”
The reservation of rights also reflected a temporary coverage position. According to plaintiff, discovery in the underlying action revealed that MTA neither disconnected the electrical cable from a power supply nor warned BSI of that cable, and that the machines supplied by BSI were operated properly at the time of the explosion. Said another way, discovery showed that the series of events giving rise to the Kennys’ injuries began with defendants’ failure to alert BSI to the “live” electrical cable, which allowed BSI to strike that cable, which, in turn, precipitated the explosion that injured Kenny.
Based on that evidence, plaintiff withdrew its defense and “disclaim [ed]” coverage for defendants in the underlying matter (cf. Matter of Worcester Ins. Co. v Bettenhauser, 95 NY2d 185, 188 [2000] [“Disclaimer ... is unnecessary when a claim falls outside the scope of the policy’s coverage portion”]), reasoning that “the uncontroverted evidence establishes that the accident was solely caused by [defendants].” In the meantime, however, plaintiff continued to defend the City in the underlying action, and the claims against the City eventually were settled through a payment plaintiff made to the Kennys on the City’s behalf.[2]
By then, plaintiff had commenced this overlying coverage action seeking judgment declaring that defendants are not entitled to coverage under the policy with respect to the underlying matter. Following motion practice, Supreme Court, among other things, entered an order and judgment granting plaintiff summary judgment and making a declaration to that effect.
*330 On appeal, the Appellate Division reversed the order and judgment and declared “that defendants were entitled to coverage in the underlying personal injury action as additional insured[s] under [the] policy” (132 AD3d 127, 139 [1st Dept 2015]; see id. at 134-138). The Appellate Division noted that “ [i] t is undisputed that Kenny’s injury was causally connected to an ‘act[ ]’ of [BSI] ” inasmuch as it was BSI’s “disturbance of [a] buried electrical cable . . . [that] triggered the explosion that led to Kenny’s fall” (id. at 134). The Appellate Division added that
“[w]hile it is true that, because [defendants] had not warned the [BSI] operator of the cable’s presence, [BSI’s] ‘act[ ]’ did not constitute negligence, this does not change the fact that the act of triggering the explosion, faultless though it was on [BSI’s] part, was a cause of Kenny’s injury. The language of the relevant endorsement, on its face, defines the additional insured coverage afforded in terms of whether the loss was ‘caused by’ [BSI’s] ‘acts or omissions,’ without regard to whether those ‘acts or omissions’ constituted negligence or were otherwise actionable” (id. at 134-135).
Given what apparently was the concern with the finality of the Appellate Division order — it left pending the counterclaim defendants asserted for attorneys’ fees pursuant to the Mighty Midgets rule[3] — Supreme Court entered a final judgment that resolved the fee question and declared that defendants “were entitled to coverage in the underlying personal injury action as additional insureds under [the] policy.” We granted plaintiff leave to appeal from that judgment (27 NY3d 905 [2016]).
Law
“ ‘In determining a dispute over insurance coverage, we first look to the language of the policy’ ” (Lend Lease [US] Constr. LMB Inc. v Zurich Am. Ins. Co., 28 NY3d 675, 681 [2017], quoting Consolidated Edison Co. of N.Y. v Allstate Ins. Co., 98 NY2d 208, 221 [2002]). “An insurance agreement,” as the ma *331 jority notes, “is subject to principles of contract interpretation” (Universal Am. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 25 NY3d 675, 680 [2015]; see majority op at 321). It also is true that, “ ‘[a]s with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and [that] the interpretation of such provisions is a question of law for the court’ ” (Lend Lease, 28 NY3d at 681-682 [emphasis added], quoting Vigilant Ins. Co. v Bear Stearns Cos., Inc., 10 NY3d 170, 177 [2008]; see Universal Am. Corp., 25 NY3d at 680, quoting Cragg v Allstate Indem. Corp., 17 NY3d 118, 122 [2011] [for the proposition that “(i)nsurance contracts must be interpreted according to common speech and consistent with the reasonable expectations of the average insured”]; see also majority op at 321).
These core principles of insurance policy construction are not the only bedrock rules relevant to this analysis {cf. majority op at 320-321). We recently reiterated that where a “ ‘policy may be reasonably interpreted in two conflicting manners, its terms are ambiguous’ ” (Lend Lease, 28 NY3d at 682, quoting Matter of Mostow v State Farm Ins. Cos., 88 NY2d 321, 326 [1996]; see Chimart Assoc. v Paul, 66 NY2d 570, 573 [1986] [“The initial question ... (in determining whether there is any ambiguity in the language) is whether the agreement on its face is reasonably susceptible of more than one interpretation”]). More specifically, we have said that “[a]mbiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties’ intent, or where its terms are subject to more than one reasonable interpretation” (Universal Am. Corp., 25 NY3d at 680 [emphasis added and internal quotation marks and citations omitted]).
To be sure, “parties cannot create ambiguity from whole cloth where none exists, because provisions ‘are not ambiguous merely because the parties interpret them differently’ ” (Universal Am. Corp., 25 NY3d at 680, quoting Mount Vernon Fire Ins. Co. v Creative Hous., 88 NY2d 347, 352 [1996]; see Selective Ins. Co. of Am. v County of Rensselaer, 26 NY3d 649, 655-656 [2016] [“A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the (agreement) itself, and concerning which there is no reasonable basis for a difference of opinion” (internal quotation marks omitted)]). “Rather, ‘the test to determine whether an insurance contract is ambiguous *332 focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech’ ” (Universal Am. Corp., 25 NY3d at 680 [emphases added], quoting Mostow, 88 NY2d at 326-327; see Cragg, 17 NY3d at 122). Of course, “ ‘any ambiguity must be construed in favor of the insured and against the insurer’ ” (Lend Lease, 28 NY3d at 682 [emphasis added], quoting White v Continental Cas. Co., 9 NY3d 264, 267 [2007]).
Analysis
The Coverage Question
The application of these canons to the subject endorsement[4] demands that we conclude that defendants are entitled to coverage with respect to the underlying matter as additional insureds under the policy. The fact that the explosion and fire were sparked by an action of BSI (the named insured on the policy) means that BSI caused the explosion, and the fact that the explosion knocked Kenny from his elevated work area means that such blast caused the underlying accident.[5] To that end, inasmuch as BSI contacted the live wire with one of its devices, it necessarily follows that BSI caused the injuries the Kennys sustained as a result of that incident. Based on that series of events, it also necessarily follows that defendants are additional insureds under the plain and obvious meaning of the endorsement in question.
Indeed, “the existence of coverage [for defendants as additional insureds] does not depend upon a showing that [BSI’s] causal conduct was negligent or otherwise at fault” (132 AD3d at 135). The endorsement confers additional insured status where the mere acts of the named insured cause the bodily injury complained of. If the drafter meant for such status to be contingent upon a negligent act or acts of the named insured, *333 then the policy easily could have said as much. That is, the policy could have afforded additional insured status “only with respect to liability for ‘bodily injury’. . . caused, in whole or in part, by . . . [the named insured’s negligent] acts or omissions.”
Similarly, if the drafter intended that coverage under the endorsement be contingent upon a showing of proximate cause, as the majority defines that phrase (see majority op at 321-322; see also infra at 335), then the policy easily could have been written to contain that condition. Specifically, the policy could have conferred additional insured status “only with respect to liability for ‘bodily injury’ . . . [proximately] caused, in whole or in part, by . . . [the] acts or omissions [of the named insured].” Inasmuch as the endorsement contains none of the aforementioned qualifications, the cardinal rules of policy interpretation require that we conclude that defendants are entitled to coverage with respect to the underlying matter as additional insureds under the policy.[6]
*334 The Majority’s Conclusion
The majority, of course, has a different interpretation of the policy (see majority op at 321). I will address each of what I perceive to be the three main flaws in its analysis in turn.
First, the majority credits plaintiffs obscurative contention with respect to the relevance of the distinction between “but-for causation” and “proximate cause” to this interpretive exercise (see majority op at 321-322). As the theory begins, the phrase “caused . . . by” has a legal meaning and must refer to either “proximate cause” or “but-for” causation {see id.). As the theory continues, the policy language “caused, in whole or in part, by . . . [BSI’s] acts or omissions” (emphasis added) must refer to “proximate cause” because “ ‘but for’ causation cannot be partial” (id. at 322).
In my view, however, there is no basis to apply a legal meaning, rather than a plain and ordinary meaning, to the word “cause” in this context (see Lend Lease, 28 NY3d at 684; Universal Am. Corp., 25 NY3d at 680; cf. majority op at 323 [concluding the “plain and ordinary meaning” of the endorsement communicates a “legal concept”]). In fact, in ascertaining the plain and ordinary meaning of a provision of an insurance policy, this Court has “regarded dictionary definitions as useful guideposts” (Yaniveth R. v LTD Realty Co., 27 NY3d 186, 192 [2016] [considering a question of statutory interpretation]; see Universal Am. Corp., 25 NY3d at 681 [relying on a dictionary to determine “the common definition(s)” of various terms contained in a rider central to the coverage question in that case]). The term “cause” refers to, among other things, “something that brings about an effect or a result” (Merriam-Webster Collegiate Dictionary 196 [11th ed 2004]; see Webster’s Third New International Dictionary 356 [2002] [defining cause as, among other things, a “thing . . . that brings about an effect”]; Oxford English Dictionary, http://www.oed.com [accessed May 19, 2017] [defining cause as, among other things, “(t)hat which produces an effect; that which gives rise to any action, phenomenon, or condition”]; Oxford Living Dictionaries, https:// en.oxforddictionaries.com/definition/cause [accessed May 16, 2017] [cause is “(a) person or thing that gives rise to an action, phenomenon, or condition”]; Cambridge Dictionary, http:// dictionary.cambridge.org/us/dictionary/english/cause [accessed *335 May 16, 2017] [cause is “something without which something else would not happen”]). The application of the plain and ordinary meaning of “cause” to the subject endorsement compels the conclusion that BSI caused the bodily injuries that Kenny sustained as a result of the accident (see supra at 332-333), and that defendants therefore are additional insureds under that amendment.[7]
Second, even if legal jargon is relevant to the meaning of “cause,” as the word is used in the subject endorsement (cf. Universal Am. Corp., 25 NY3d at 680 [“the test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech” (internal quotation marks omitted)]; Cragg, 17 NY3d at 122 [“(i)nsurance contracts must be interpreted according to common speech”]), defendants still would qualify as additional insureds under the policy. To the extent “cause” somehow could be seen to mean “proximate cause” (cf. Royal Indem. Co. v Providence Washington Ins. Co., 92 NY2d 653, 659 [1998] [refusing to read into an insurance policy a condition that does not exist therein]), a reasonable mind could define it as something “that is legally sufficient to result in liability” (Black’s Law Dictionary 265 [10th ed 2014] [defining “proximate cause”]; see majority op at 321-322). This is not, however, to say that “proximate cause” has only one meaning; it also has been defined as “[a] cause that directly produces an event and without which the event would not have occurred” (Black’s Law Dictionary 265 [10th ed 2014]).
In view of those competing definitions, projecting the phrase “proximate cause” into the subject endorsement merely would *336 give rise to an ambiguity with respect to the scope of that endorsement (see generally Universal Am. Corp., 25 NY3d at 680) that still would result in coverage for defendants. The majority subtly suggests that any ambiguity should be construed in favor of plaintiff because NYCTA “craft [ed] the additional insured endorsement” and “required that the policy include [the subject] additional insured coverage” (majority op at 326; see generally State of New York v Home Indem. Co., 66 NY2d 669, 671 [1985]). The same suggestion is buttressed by reference to the post hoc plea of the drafter of at least one of the subject endorsements that such amendment intended to “ ‘preclu[de] . . . coverage for an additional insured’s sole negligence’ ” (majority op at 326, quoting Randy J. Maniloff, Coverage for Additional Insured-Vendors: Recent Markdowns by ISO and New York’s High Court, 19-36 Mealey’s Litig Rep Ins 11 [2005]).[8] The rule, however, remains that ambiguous policy language is interpreted in favor of the insured (see Lend Lease, 28 NY3d at 682; White, 9 NY3d at 267; Breed v Insurance Co. of N. Am., 46 NY2d 351, 353 [1978]).[9] To that end, even assuming that “cause,” as it is used in the subject endorsement, is ambiguous, we still must conclude that the policy contains coverage for defendants with respect to the underly *337 ing matter inasmuch as the accident was “produce [d]” by and “would not have occurred” (Black’s Law Dictionary 265 [10th ed 2014] [defining “proximate cause”]) absent BSI’s operation of its excavation equipment (cf. Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315 [1980] [“There are certain instances . . . where only one conclusion may be drawn from the established facts and where the question of legal cause may be decided as a matter of law”], rearg denied 52 NY2d 784 [1980]).
Third, and finally, the majority misses the mark with its conclusion that the reference to “liability” in the subject endorsement modifies the “caused . . . by” language of that amendment (see majority op at 323).[10] Under the plain language of the subject endorsement, the phrase “liability for ‘bodily injury’ ” articulates one of the classes of risks covered by that part of the policy, whereas the phrase “caused . . . by . . . [BSI’s] acts or omissions” speaks to the circumstances that trigger that coverage (see Worth Constr. Co., Inc. v Admiral Ins. Co., 10 NY3d 411, 415-416 [2008]). If plaintiff wanted the endorsement to limit coverage to circumstances in which the named insured (here, BSI) was negligent, then it should have written the policy to say as much. To the extent the endorsement does not unambiguously confer additional insured status upon defendants in this instance (cf. supra at 332-333), the majority’s analysis ignoring what at “worst” (from the prospective of the putative additional insureds) is an ambiguity in that language overlooks our teachings that, when there is doubt with respect to the meaning of an insurance policy, an insurer should revise the policy so as to leave no doubt as to the meaning of that contract.[11]
*338 The Effect of the Majority’s Ruling
In multi-jurisdictional commercial transactions, New York law frequently is chosen as the governing law based on its stability and predictability. Insurance coverage matters of this nature perhaps are a small subset of the expansive field of commercial litigation.
Similar to “typical” commercial litigation, however, insurance coverage disputes should be resolved through law that is certain and clear. The majority’s approach could threaten the stability and sureness of our bedrock rules of insurance policy interpretation. Indeed, it is the benefit of certainty in our rules of interpretation, not concern with the occasionally “unanticipated result! ]” (majority op at 326) to which the application of those rules may lead, that should be of paramount importance here.
By extension, that approach could also threaten the likely millions of consumers of insurance in this state by providing a rationale to read into insurance contracts language that is not there, “[insurance in modern society affects an overwhelming part of the population” (68 NY Jur 2d, Insurance § 1). To that end, in furtherance of the public interest (see generally Curiale v Ardra Ins. Co., 88 NY2d 268, 276 [1996]), the legislature has, either of its own accord or through latitude afforded the current and former incarnations of the State Insurance Department (see Insurance Law § 301), protected consumers who purchase insurance — such as “auto,” “home,” and “life” policies — for everyday needs. Indeed, that deliberative body has either enacted or countenanced numerous protective rules with respect to minimum standards and mandatory policy language (see e.g. Insurance Law art 34; 11 NYCRR parts 52, 60).
For its part, this Court has long promoted certainty and safeguard in crafting its rules of policy interpretation. Insurance contracts are to be viewed through the eyes of the average consumer and deciphered not through “legalese,” but by *339 means of plain and common speech. Moreover, where there is uncertainty with respect to the existence of coverage, we fall on the side of the insured and conclude that coverage exists.
The majority’s decision obviously impacts the subject endorsement and similar policy language. We hope, however, that its reach will not extend more broadly and that its effect will not be destructive. At best, the decision reflects a departure from, but not a disavowal of, long-held precepts of policy construction.
Chief Judge DiFiore and Judges Garcia and Wilson concur; Judge Fahey dissents and votes to affirm in an opinion in which Judge Stein concurs.
Judgment appealed from and order of the Appellate Division brought up for review reversed, with costs, plaintiff’s motion for summary judgment on the first cause of action granted, defendants’ cross motion for summary judgment on the first cause of action denied, and case remitted to the Appellate Division, First Department, for further proceedings in accordance with the opinion herein.

. This dispute actually implicates multiple additional insured endorsements. The endorsement on which defendants (and the majority [see majority op at 317-318]) rely bears form No. IFG-I-0160 1100 and confers additional insured status upon entities with respect to which BSI had “agreed in writing in a contract . . . [would] be added as an additional insured on [the] policy.” As noted, this conferral of coverage is a qualified one; pursuant to this endorsement, such entities are entitled to coverage as additional insureds “with respect to liability for ‘bodily injury’ . . . caused, in whole or in part, by . . . [BSI’s] acts or omissions” (emphasis added).
Plaintiff relies on a different endorsement, which bears form No. CG 20 26 07 04 and which designates NYCTA as an additional insured. Similar to the “other” endorsement, this amendment provides coverage with respect to liability for bodily injury “caused, in whole or in part, by [BSI’s] acts or omissions.” Inasmuch as the coverage afforded under each such endorsement essentially is the same, for the purposes of my analysis it is of no moment that the parties rely on different amendments in seeking to establish what, if any, coverage plaintiff may owe defendants with respect to the underlying action (cf. majority op at 326).

. The Kennys’ claims against BSI were dismissed with prejudice on the Kennys’ own motion.

. Under that rule, an insured “cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations” may recover attorneys’ fees and expenses incurred in defending against the insurer’s “affirmative action ... to settle its rights” where the insured prevails in that action (Mighty Midgets v Centennial Ins. Co., 47 NY2d 12, 21 [1979]).

. As noted, the endorsement on which defendants (and the majority) rely provides, in relevant part, that defendants are additional insureds under the policy “with respect to liability for ‘bodily injury’. . . caused, in whole or in part, by . . . [BSI’s] acts or omissions” (emphasis added).

. Of course, there may be more than one cause of an accident (see generally Mazella v Beals, 27 NY3d 694, 706 [2016], citing Argentina v Emery World Wide Delivery Corp., 93 NY2d 554, 560 n 2 [1999]). Based on their failure to alert BSI to the “live” electrical cable, defendants surely contributed to the happening of the accident. That fault, however, does not mean that BSI’s actions in contacting the wire were not a (non-negligent) cause of that incident.

. Although not determinative of this coverage question, this analysis is consistent with Appellate Division case law (see e.g. Aspen Specialty Ins. Co. v Ironshore Indem. Inc., 144 AD3d 606, 607 [1st Dept 2016]; Kel-Mar Designs, Inc. v Harleysville Ins. Co. of N.Y., 127 AD3d 662, 663 [1st Dept 2015]; Strauss Painting, Inc. v Mt. Hawley Ins. Co., 105 AD3d 512, 513 [1st Dept 2013], mod on other grounds 24 NY3d 578, 595-596 [2014], rearg denied 24 NY3d 1217 [2015]; National Union Fire Ins. Co. of Pittsburgh, PA v Greenwich Ins. Co., 103 AD3d 473, 474 [1st Dept 2013]; W & W Glass Sys., Inc. v Admiral Ins. Co., 91 AD3d 530 [1st Dept 2012]).
Moreover, the inconsistency of this analysis with National Union Fire Ins. Co. of Pittsburgh, PA v XL Ins. Am., Inc. (2013 WL 1944468, 2013 US Dist LEXIS 68467 [SD NY, May 7, 2013, No. 12 Civ 5007 (JSR)]) and Dale Corp. v Cumberland Mut. Fire Ins. Co. (2010 WL 4909600, 2010 US Dist LEXIS 127126 [ED Pa, Nov. 30, 2010, No. 09-1115]) is of no moment (cf. majority op at 324-325). In National Union Fire Ins. Co., the Southern District acknowledged that “the phrase ‘caused by’ does not obviously disclose a singular meaning” (2013 WL 1944468, *6, 2013 US Dist LEXIS 68467, *20)— thereby hinting at an ambiguity in the endorsement — before “adopting] the reasoning of Dale . . . and holding] that ‘caused by’ requires a showing that [the acts or] operations [of the named insured] proximately caused the bodily injury [at issue]” (2013 WL 1944468, *7, 2013 US Dist LEXIS 68467, *21). Dale, however, projected the “proximately caused” language into an endorsement substantively identical to that at issue here (see Dale, 2010 WL 4909600, *1, 2010 US Dist LEXIS 127126, *3-4) based on the “drafter’s history” (2010 WL 4909600, *7, 2010 US Dist LEXIS 127126, *21) — specifically, the “hope[ ]” of the drafter for a “narrow[ ] coverage interpretation” (see 2010 WL 4909600, *5, 2010 US Dist LEXIS 127126, *16). Based on our rules of policy interpretation, it is the policy’s language (see Lend Lease, 28 NY3d at *334 681; Consolidated Edison Co., 98 NY2d at 221), not the drafter’s explanation of that language, that drives a coverage analysis.

. Two additional points are relevant here.
First, in lieu of acknowledging and addressing the litany of dictionary definitions that compel the conclusion that defendants are entitled to coverage with respect to the underlying matter as additional insureds under the policy (see supra at 334-335), the majority advances an unavailing argumen-tum ad absurdum (see majority op at 325 n 4).
Second, the majority’s point that its “analysis [to the contrary] should come as no surprise to the industry because the drafters of the language used here intended it to mean proximate causation” (majority op at 326; see id., citing Randy J. Maniloff, Coverage for Additional Insured-Vendors: Recent Markdowns by ISO and New York’s High Court, 19-36 Mealey’s Litig Rep Ins 11 [2005]) is of no moment. Irrespective of whether the reference to “industry” pertains to the insurance industry or to the construction industry, the point remains that the intent of the drafter is immaterial to this analysis. It is what the drafter said, not what the drafter may have meant to say, that guides our review of this coverage question.

. As noted (see supra at 328 n 1), two endorsements are relevant to this matter. One such endorsement, on which plaintiff relies, bears both form No. CG 20 26 07 04 and an Insurance Services Office (ISO) copyright. The other such endorsement, on which defendants (and the majority) rely, bears form No. IFG-I-0160 1100, but has no ISO copyright.
The point remains that the intent of the drafter is immaterial to this coverage analysis (see supra at 335 n 7). The majority’s reference to extrinsic evidence of what apparently was ISO’s intent to “ ‘preclu[de] . . . coverage for an additional insured’s sole negligence’ ” (majority op at 326, quoting Randy J. Maniloff, Coverage for Additional Insured-Vendors: Recent Markdowns by ISO and New York’s High Court, 19-36 Mealey’s Litig Rep Ins 11 [2005]) in form No. CG 20 26 07 04, however, is misplaced for an additional reason: such evidence does not apply to the endorsement on which defendants and the majority rely. That amendment does not bear an ISO copyright, meaning that it apparently was prepared by a different drafter and therefore may have been based on intent different from that underlying the “CG” form in question.

. There is no contention that the rule that an ambiguity in the policy should be construed against the insurer that drafted that compact does not apply on the ground that “the basic concept and terms [of the endorsement] originated with [defendants], that [defendants are] sophisticated and [were] instrumental in crafting various parts of the agreement, and that [defendants], while not an insurance company, had equal bargaining power and acted like an insurance company by maintaining a self-insured retention” (Cummins, Inc. v Atlantic Mut. Ins. Co., 56 AD3d 288, 290 [1st Dept 2008]).

. As (twice previously) noted, the endorsement on which defendants (and the majority) rely provides, in relevant part, that defendants are additional insureds under the policy “with respect to liability for ‘bodily injury’ . . . caused, in whole or in part, by .. . [.BSI’s] acts or omissions” (emphasis added).

. There are two notable (and intentional) omissions from my review of this coverage question. First, I have not compared the phrase “arising out of” — which this Court has treated in, among other cases, Maroney v New York Cent. Mut. Fire Ins. Co. (5 NY3d 467, 472 [2005]) — to the phrase “caused . . . by.” This case turns on our interpretation of the instant “caused . . . by” language, not on the question whether the “caused . . . by” phrase should or should not have the same meaning as the “arising out of” language we addressed in Maroney and in other cases. It suffices to say that interpreting the phrases “arising out of” and “caused . . . by” differently does not compel the conclusion that the latter phrase incorporates a negligence requirement.
*338 Second, I also have not treated plaintiff’s contention that the volunteer doctrine does not apply here (see Dillon v U-A Columbia Cablevision of Westchester, 100 NY2d 525, 526 [2003]; National Union Fire Ins. Co. v Ranger Ins. Co., 190 AD2d 395, 397 [4th Dept 1993]; cf. 132 AD3d at 133-134 [addressing the cause of action for subrogation that plaintiff asserted against NYCTA, which has no bearing on this case to the extent defendants are covered under the policy]). I agree with the majority’s implicit conclusion (see majority op at 327) that the question whether to apply the volunteer doctrine here is best left to the Appellate Division.